# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ELIOT WASHINGTON, RICHARD STRODE,
FELITA DANIELS-ASHLEY, and
METROPOLITAN MILWAUKEE FAIR
HOUSING COUNCIL, INC,
                    **Plaintiffs,**[1]

   v.                                                      Case No. 05-C-673

JAMES KRAHN, PATRICK SZYDEL, and
THEODORA SZYDEL,
                    **Defendants,**
   and

RURAL MUTUAL INSURANCE COMPANY,
                    **Intervening Defendant.**

## DECISION AND ORDER

Plaintiffs bring this action under 42 U.S.C. §§ 1982 and 3604 for the purpose of redressing racial discrimination in housing. The individual plaintiffs are African-American testers[2] who participated in a program conducted by the Metropolitan Milwaukee Fair Housing Council ("MMFHC") to determine whether the defendants were engaging in unlawful discriminatory housing practices. Plaintiff MMFHC is an organization that works to ensure equal access to housing. In 2003, the testers posed as potential renters of apartments located in two buildings in West Allis, Wisconsin, ("the buildings") owned by defendant James Krahn and managed by defendants Patrick ("Patrick") and Theodora ("Theodora") Szydel. Between July and November 2003, the testers asked Patrick or Theodora whether any apartments were available in the buildings and received negative responses. However, white

---

[1]Plaintiffs do not object to defendants' request to dismiss plaintiff Sheryl Sims-Daniels's claim. Therefore, I will grant defendants' request and amend the caption accordingly.

[2]Testers pose as potential renters in order to monitor compliance with fair housing laws. Havens Realty Corp. v. Coleman, 455 U.S. 363, 373 (1982).

testers received positive responses and defendants' records indicate that during such period at least one apartment was vacant. The testers allege that defendants intentionally discriminated against them based on their race and that as a result they suffered humiliation and other emotional distress. MMFHC alleges that defendants' discriminatory acts frustrated its purpose and served as a drain on its resources.

Defendants now move for partial summary judgment on a number of grounds. They argue that plaintiffs' § 1982 claims must be dismissed because plaintiffs lack standing and fail to establish a prima facie case. Defendants also argue that plaintiff Richard Strode's Fair Housing Act ("FHA") claim must be dismissed because he fails to establish a prima facie case. Finally, defendant Krahn argues that plaintiffs' claim against him for punitive damages must be dismissed. I may grant defendants' motions only if there are no genuine issues of material fact and defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In considering defendants' motion, I take all facts and reasonable inferences therefrom in the light most favorable to plaintiffs. Matsushita Elec. Indus. Co. v. Zenith Radio Corp, 475 U.S. 574, 586-87 (1986). I address each of the issues presented in turn. However, with respect to plaintiffs' § 1982 claims, I conclude that plaintiffs lack standing; thus I need not address whether they establish a prima facie case under that statute.

## I. SECTION 1982 CLAIMS

A challenge to a plaintiff's standing to assert a particular claim raises the question of whether the plaintiff has a legal right to judicial relief in a federal court. Wm. J. Fletcher, The Structure of Standing, 98 Yale L.J. 221, 264 (1988). In the present case, plaintiffs attempt to assert a claim under § 1982, which provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to

inherit, purchase, lease, sell, hold and convey real and personal property." The Supreme Court has not yet determined whether testers have standing to bring an action under § 1982. See Havens Realty, 455 U.S. at 367 n.2 (declining to examine tester standing under § 1982); Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209 n.8 (1972) (declining to examine standing in general under § 1982). The Third and Eleventh Circuits have determined that testers have such standing. Watts v. Boyd Prop., Inc., 758 F.2d 1482 (11th Cir. 1985); Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894 (3rd Cir. 1977). The Seventh Circuit has not directly addressed the question, although district courts in this circuit have agreed with the Third and Eleventh Circuits. See, e.g., City of Evanston v. Baird & Warner, Inc., No. 89C1098, 1990 U.S. Dist. LEXIS 15407, at *12-18 (N.D. Ill. Nov. 13, 1990); Leadership Council for Metro. Open Cmtys. v. Chi. S.W. Holiday Inn, No. 84C7564, 1986 U.S. Dist. LEXIS 25879, at *9-10 (N.D. Ill. May 5, 1986).

However, in Kyles v. Guardian Security Services, Inc., 222 F.3d 289 (7th Cir. 2000), the Seventh Circuit, following Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268, 1270-72 (D.C. Cir. 1994), held that because they do not actually intend to accept employment, employment testers lack standing to assert employment discrimination claims under 42 U.S.C. § 1981. I cannot reasonably distinguish Kyles because it addresses § 1981 rather than § 1982. Sections 1981 and 1982 are historically interrelated and the Supreme Court has suggested that they should be construed similarly. Runyon v. McCrary, 427 U.S. 160, 171 (1976); see also Kyles, 222 F.3d at 301 (noting that the two statutes have similar purposes and are phrased similarly). Thus, I conclude that Kyles compels me to deny the testers standing to assert claims under § 1982.

However, I strongly disagree with the decision in Kyles and, in a spirit of respectful disagreement, will briefly discuss the issue.[3]

The question presented in Kyles, whether testers may assert claims under § 1981, is one of statutory standing. Statutory standing cases are not conceptually difficult. To determine whether a plaintiff has standing, a court looks to the statute in question. Fletcher, supra, at 264. Resolution of the issue depends on the nature of the right created by the statute and whether a grant of standing is an appropriate means of implementing or protecting that right. Id. at 246. If, as in the present case, the statute does not contain a clear directive as to who may assert a claim, the question is whether the court may fairly derive an inference with respect to Congressional intent from the statute and other relevant legal materials.

Based on § 1981's language protecting "the right to enter and enforce a contract," the Kyles court inferred that Congress intended to grant standing only to a narrow category of potential plaintiffs – those who would accept an offer of employment if extended – a category which excludes testers. 222 F.3d at 302 (stating that the tester plaintiffs' goal was, at most, to have "the opportunity to decline an offer of employment"). In reaching this decision, the court stated that "there is nothing in section 1981's language suggesting that Congress meant to stretch standing to the limits of Article III." Id. at 303.

I believe that the inference that the Kyles court drew with respect to Congressional intent is problematic. In 1866, when Congress enacted the Civil Rights Act that included the language that became §§ 1981 and 1982, the doctrine of standing as such did not exist and the term "standing" was not used in connection with the determination of a person's right to

---

[3] I note that because the Third and Eleventh Circuits hold that housing testers have standing under § 1982 and the D.C. and Seventh Circuits hold that employment testers lack standing under § 1981, there is a circuit split on the issue of tester standing to sue under the reconstruction-era civil rights statutes.

sue. Flecher, supra, at 224-25. Moreover, the language of §§ 1981 and 1982 is very general. Thus, it cannot be reasonably asserted that when Congress enacted the Civil Rights Act of 1866, it intended to confer standing only narrowly.

Further, when a court considers the purpose of the statute and the context in which Congress enacted it, it can only conclude that granting standing to testers is entirely consistent with Congressional intent. Congress enacted the Civil Rights Act of 1866 pursuant to the Thirteenth Amendment as part of a comprehensive and revolutionary attempt to overcome systemic racial discrimination. Runyon, 427 U.S. at 168-70. Senator Lyman Trumbull, the author of the statute, explained that by abolishing slavery, the Thirteenth Amendment guaranteed freedom to all Americans and that the purpose of the Civil Rights Act was to give effect to that guarantee by securing "all persons within the United States practical freedom." Robert J. Kaczorowski, The Enforcement Provision of the Civil Rights Act of 1866: A Legislative History in Light of Runyon v. McCrary, 98 Yale L.J. 565, 569-70 (1989) (quoting Cong. Globe, 39th Cong., 1st Sess. 475 (1866) (Sen. Trumbull). The Supreme Court has recognized this purpose, stating that §§ 1981 and 1982 should be construed liberally in accordance with "the broad and sweeping nature of the protection meant to be afforded by § 1 of the Civil Rights Act of 1866," Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237 (1969), and to "effectuate the[ir] remedial purposes," Memphis v. Greene, 451 U.S. 100, 120 (1980). See also Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 176 (2005) (stating that in Sullivan "we interpreted a general prohibition on racial discrimination, to cover retaliation against those who advocate the rights of groups protected by that prohibition") (footnote omitted).

The Kyles court ignored the grand purpose for which Congress enacted the Civil Rights Act of 1866 and the broad and sweeping nature of the protection it affords and divested it of

its public aspects. Whether a prospective employee, tenant or home buyer actually intends to accept an offer has no bearing on whether she is the object of invidious racial discrimination. Because the purpose of §§ 1981 and 1982 is to prohibit discrimination, only the intentions of a defendant (who does not know of a tester's intentions when making a discriminatory decision) are relevant. And for good reason – if an employer or landlord refuses to consider minority applicants for a job or an apartment, such applicants cannot reasonably be said to enjoy the same right to contract or lease property as other citizens. See Jonathan Levy, Comment: In Response to Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.: Employment Testers Do Have a Leg to Stand On, 80 Minn. L. Rev. 123, 154-55 (1995) (arguing that because "purposeful discrimination in itself violates § 1981," testers' intentions should not determine their rights).

The Kyles decision also diminished the usefulness of §§ 1981 and 1982 in combating discrimination. The crucial role of testers in gathering evidence of discrimination cannot be disputed. Indeed in Richardson v. Howard, 712 F.2d 319, 321 (7th Cir. 1983), the Seventh Circuit recognized the importance of testers, stating:

> It is frequently difficult to develop proof in discrimination cases and the evidence provided by testers is frequently valuable, if not indispensable. It is surely regrettable that testers must mislead commercial landlords and homeowners as to their real intentions . . . . Nonetheless, we have long recognized that this requirement of deception was a relatively small price to pay to defeat racial discrimination. The evidence provided by testers both benefits unbiased landlords by quickly dispelling false claims of discrimination and is a major resource in society's continuing struggle to eliminate the subtle but deadly poison of racial discrimination.

See also Michelle Landever, Tester Standing in Employment Discrimination Cases Under 42 U.S.C. § 1981, 41 Clev. St. L. Rev. 381, 385, 395 (1993) (stating that testing is an invaluable tool for combating racial discrimination and that allowing tester standing offers remedies for discrimination not otherwise attainable).

In sum, permitting testers to assert claims under §§ 1981 and 1982 is consistent with the general language of those statutes and with their history and purpose. The EEOC, whose view is entitled to some deference, appears to agree. See EEOC, Enforcement Guidance No. N-915.002 ("Enforcement Guidance: Whether 'Testers' Can File Charges and Litigate Claims of Employment Discrimination") (May 22, 1996), reprinted in Fair Employment Practices Manual (BNA) 405:6899 (2000) (noting that § 1982 "contains no language about the need for a bona fide offer as a condition for some challenges"). To state a claim under § 1981 or § 1982, a plaintiff should have to allege only that she was the subject of racial discrimination in connection with the defendant's consideration of her inquiry or application concerning employment or property and that she suffered harm as a result.

Kyles similarly compels me to deny standing to MMFHC. Like the testers, MMFHC had no interest in actually entering into a rental agreement with defendants.

## II. STRODE'S FHA CLAIM

Defendants also argue that plaintiff Strode fails to establish a prima facie case of discrimination under the FHA, § 3604. To establish a prima facie case under § 3604, a plaintiff must show that: 1) she is a member of a racial minority; 2) she requested information about the availability of an apartment; 3) defendants provided her with false information; and 4) defendants provided truthful information to white applicants. Darby v. Heather Ridge, 806 F. Supp. 170, 176 (E.D. Mich. 1992). Defendants contend that even if Strode can show that they provided him with inaccurate information, he cannot establish that they gave truthful information to white applicants.

The relevant facts are as follows: on September 17, 2003, Patrick told Strode and a white tester that no apartments would be available until November. However, while Patrick was speaking with the white tester, Theodora stated that an apartment would be available in

October. Patrick indicated that he had forgotten about that apartment, and then showed it to the white tester. On September 22, Patrick told a second white tester in a telephone conversation that he had no vacancies at the buildings, but that an apartment was available at another of Krahn's West Allis properties, and told Strode the same thing. Also on September 22, Patrick told the original white tester that an apartment would be available in October.

Plaintiffs present sufficient evidence to enable a reasonable fact finder to conclude that Patrick provided truthful information to a white applicant and hid such information from Strode. Patrick knew by the end of September 17 that an apartment would be available in October but, nevertheless, told Stroke on September 22 that no apartments would be available until November. And he subsequently told a white tester that an apartment would be available earlier. Although Patrick's September 22 statement to the second white tester complicates the matter somewhat, Patrick's other statements considered in conjunction with other evidence, including the other testers' experiences and the small percentage of minorities living in the buildings, could support an inference of discrimination. Patrick made his September 22 statement to the second white tester over the phone, and he did not know the tester's race.

### III. KRAHN LIABILITY FOR PUNITIVE DAMAGES

A housing discrimination plaintiff may recover punitive damages when the defendant recklessly or callously disregards his rights or intentionally violates federal law. United States v. Balistrieri, 981 F.2d 916, 936 (7th Cir. 1992) (citing Smith v. Wade, 461 U.S. 30, 51 (1983)). A building owner is subject to punitive damages based on the discriminatory acts of her agent "'only if she knew of or ratified the acts.'" City of Chicago v. Matchmaker Real Estate Sales Center, 982 F.2d 1086, 1100 (7th Cir. 1992) (quoting Hamilton v. Svatik, 779 F.2d 383, 389 (7th Cir. 1985)). A jury may reasonably conclude that a building owner knew of or ratified her

agent's conduct when the owner had the final say concerning rents and practices and often went to the building. Balistrieri, 981 F.2d at 930, 936.

In the present case, a jury could reasonably find that Krahn knew of or ratified the Szydels' allegedly discriminatory acts. Here, as in Balistrieri, Krahn was a hands-on property owner. He monitored vacancies, advertised for tenants, and alerted the Szydels when an apartment became available. He established the criteria for selecting tenants. Although he did not meet with prospective tenants, he required the Szydels to give him their impressions of prospective tenants and he personally chose among prospective tenants based on their applications and the Szydels' comments. Krahn contends that he had no knowledge of applicants' races. However, he knew of only one African-American who had previously rented an apartment in the buildings. In addition, he did not provide the Szydels with information regarding fair housing laws and did not display an equal housing opportunity poster. Thus, a reasonable factfinder could infer that Krahn knew of or ratified the Szydels' alleged discriminatory actions. Therefore, I cannot rule out the possibility of punitive damages.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that defendants' motion for partial summary judgment with respect to plaintiff Sims-Daniels' claims is **GRANTED**, and Sims-Daniels is **DISMISSED** from this action.

**IT IS FURTHER ORDERED** that defendants' motion for partial summary judgment with respect to plaintiffs' § 1982 claims is **GRANTED**.

**IT IS FURTHER ORDERED** that defendants' motion for partial summary judgment with respect to plaintiff Strode's FHA claim is **DENIED**.

**IT IS FURTHER ORDERED** that defendant Krahn's motion for partial summary judgment with respect to plaintiffs' claim for punitive damages is **DENIED**.

Dated at Milwaukee, Wisconsin, this 26 day of December, 2006.

/s
LYNN ADELMAN
District Judge